JjCLARENCE E. McMANUS, Judge.
At issue in this suit on a promissory note is whether the purchase of shares of stock via a promissory note is an absolute or relative nullity under La. R.S. 12:52 C, voiding the transaction at issue in this case. Defendant appeals the trial court’s judgment ruling that the promissory note giving rise to this suit is enforceable against defendant because although the transaction in this case is a relative nullity, defendant may not invoke any ground to nullify the transaction. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY

At the outset, we note that the First Circuit has decided a related case involving a different defendant asserting claims similar to those presented herein. See, Hibernia National Bank, as Trustee of the Blossman Group Trust v. Johnny Smith, 96-1106 (La.App. 1 Cir. 6/20/97), 697 So.2d 1051, writ denied, 97-2382 (La.1/9/98), 705 So.2d 1101.
In July 1984, defendant, Kenneth Kue-bel, was approached by Joe Brocato, a friend of his, who asked him to buy some stock in St. Tammany Corporation, (STC). According to Kuebel, Brocato and another individual named Ronald Case Ladvised Kuebel that, if he executed a note for the shares of stock in STC, the growth dividends would be sufficient to retire the note within several years, and he would not have to put up any money. Brocato also allegedly told Kuebel that there would be a market for the stock such that he could liquidate it whenever he wanted. Kuebel noted that, at the time Brocato approached him he was carrying $17 million in loans, and Brocato promised that the “vault doors would be open” to him if he agreed to participate in this deal.
Later in 1984, defendant subscribed to shares in STC and executed a promissory note in the amount of $468,253.44, bearing 10% interest, payable to STC as payment for shares under the subscription agreement. With the signing of the promissory note, Kuebel also executed a stock pledge agreement, pledging the STC stock as security for repayment of the note.
Brocato and Case approached other investors who likewise executed promissory notes and other documents to purchase shares of stock in STC. Brocato and Case had incorporated STC to serve as a commercial vehicle for the acquisition of First National Corporation (FNC), a bank holding company owned by the Blossman family whose principal asset was First National Bank of St. Tammany Parish. FNC and STC executed a Reorganization and Merger Agreement. The principals of the Blossman Group received the promissory notes and pledge agreements in exchange for their controlling interest in FNC. The notes and pledge agreements were then held in trust by the Blossman Group Trust for the benefit of the principals. The FNC stock held by the Blossmans was cancelled, and FNC stock was then exchanged for the STC stock held by defendant and other STC stockholders.
In 1984 and 1985, Kuebel sold some of his FNC stock and benefited from a stock split. The sale proceeds of $329,999.00 were applied as a payment on the promissory note, thereby reducing his indebtedness to $138,253.44. He also paid | interest on the note for four years, but subsequently defaulted on the note when *972 FNC failed in 1988. FNC’s assets were acquired by Hibernia Bank on November 18, 1988. Hibernia filed this suit on the promissory note against Kuebel as Trustee of the Blossman Group Trust, but the trust later terminated and Richard S. Blossman, as agent of the Blossman Group, was substituted as proper party plaintiff.
Kuebel filed an answer and reconven-tional demand alleging that the note was null and void on various grounds, but principally because it was executed in exchange for STC stock in violation of La. R.S. 12:52 C. He later filed a motion for summary judgment urging that the sale of stock in exchange for a promissory note is void ab initio as being against public policy and express provisions of the law.
The trial court denied the motion and this matter proceeded to a bench trial commencing on April 16, 2002. Following that trial, the court found for the plaintiff and awarded judgment in favor of Hibernia against Kuebel in the amount of $138,253.44 with interest in the amount of $188,366.06 making the total award $326,619.50. The trial court also dismissed Kuebel’s reconventional demand.
In providing its reasons for judgment, the trial court confirmed its reliance on the Smith decision, supra, as the law controlling this case. As in that decision, the trial court in this case found La. R.S. 12:52 C applied and that the transaction at issue, the sale of stock via a promissory note, constituted a relative nullity.
Next, the trial court addressed the issue of whether Mr. Kuebel could invoke any ground for relative nullity under La. R.S. 12:52 C; and, after enunciating several reasons, the trial court concluded that Mr. Kuebel could not avail himself of any ground for relative nullity under La. R.S. 12:52 C.
The trial court also found that the note constituted an unconditional promise to pay by Mr. Kuebel through his action of ratifying the agreement by making four | Syears of payments, selling some of the stock at issue and then using those proceeds to pay down the note. The court further stated even though the note’s endorsement is payable to the Blossman Group, rather than the Blossman Group Trust, that language does not render the unconditional promise to pay a conditional promise to pay. The court relied on La. Code Civ. P. arts. 687-700 and La. R.S. 10:3-106 and 110 in support. Additionally, the court further concluded that the mere fact that the pledge agreement was a separate document from the note did not destroy the note’s status as an unconditional promise to pay. The trial court reasoned that the note amounted to in personam instrument rather than an in rem negotiable instrument even though the instrument refers to the pledge agreement, the security for the loan.
Kuebel moved for a new trial and also filed a motion to dismiss for abandonment. Hibernia filed a motion to assess attorney fees and costs. The trial court denied Kuebel’s motion for new trial and motion to dismiss. The trial court assessed attorney fees against defendant at 20% of $326,619.20 together with interest of 10% per annum as set forth in the note until paid. This appeal followed.

DISCUSSION

We first address the applicability of the First Circuit’s holding in the Smith case to the facts of this case. In Smith, plaintiff, Hibernia, sued defendant, Johnny Smith, to enforce the promissory note Smith executed to purchase initial shares of stock in STC. He pledged the stock to secure payment of the note. The STC stock was essentially converted to FNC stock. The *973 Blossmans received cash and promissory-notes in exchange for the cancellation of their FNC stock. Like defendant Kuebel in this case, Smith paid the interest on his note until the bank closed in 1988 and then defaulted on the loan. After Hibernia filed suit, Smith moved for summary judgment; and the trial court granted summary judgment holding that the note was void ab initio, that is, an absolute nullity. Hibernia | ^appealed; and the First Circuit reversed the trial court, finding that defendant was not entitled to summary judgment as a matter of law and concluding that the trial court committed error in granting summary judgment.
In its analysis, the First Circuit first determined that La. R.S. 12:52 C applied to the promissory note at issue in the ease, rather than La. R.S. 12:52 B. In pertinent part, La. R.S. 12:52 B and C provide:
B. Shares issued (1) in payment of a stock dividend, (2) pursuant to exercise of conversion rights, (3) in exchange for or in respect of, outstanding shares pursuant to a reclassification of stock, or (4) in a merger or consolidation as provided in the merger or consolidation agreement ... shall be considered as fully paid when so issued.
C. The consideration for shares issued otherwise than as stated in subsection B of this section, shall be paid in cash or in corporeal or incorporeal property, or services actually rendered to the corporation, the fair value of which is not less than the dollar amount of the consideration fixed for the shares, before the shares are issued. Upon payment of the consideration fixed therefor, such shares shall be considered as fully paid. Cash consideration for shares may not be paid by the purchaser’s note, secured or unsecured, or uncertified check; and in case of delivery of such a note or check in payment for shares, the shares shall not be issued until the note or check has been paid in full.
The First Circuit reasoned that 12:52 C applied because the focus of the transaction at issue was Smith’s purchase of STC stock via a promissory note and that exchange violated 12:52 C. The court then concluded that the violation of 12:52 C was a relative nullity, not an absolute nullity. In reaching that conclusion, the court referred to articles 2030 and 2031 of the Louisiana Civil Code. Article 2030, which addresses the absolute nullity of contracts, provides:
A contract is absolutely null when it violates a rale of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed.
Absolute nullity may be invoked by any person or may be declared by the court on its own initiative.
Article 2031 addresses the relative nullity of contracts and provides:
A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give |7free consent at the time the contract was made. A contract that is only relatively null may be confirmed.
Relative nullity may be invoked only by those persons for whose interest the ground for nullity was established, and may not be declared by the court on its own initiative.
The Smith court stated that La. R.S. 12:52 C does not specify that a stock purchase on credit is an absolute nullity. Rather, La. R.S. 12:52 C provides a method for confirming the sale: “... the shares shall not be issued until the note or check has been paid in full.” Thus, the court concluded, a transaction in which a note is given for shares of stock is a relative nulli *974 ty that may only be invoked by those for whose interest the ground for nullity was established; and Johnny Smith was not one of those individuals. Applying the de novo standard of review, the First Circuit reversed the summary judgment because, as a matter of law, defendant, Johnny Smith, was not entitled to summary judgment. As did the trial court in this case, we agree with the First Circuit’s statement of the law in Smith and find that law to be controlling herein.
Having clarified the controlling law, we next note that the applicable standard of review for the trial court’s judgment is manifest error. It is well settled that a court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is clearly wrong. Touchard v. Slemco Elec. Foundation, 99-3577 (La.10/17/00) 769 So.2d 1200, 1204. When there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Id. Therefore, the issue for the reviewing court is not whether the trier of fact was wrong, but whether the fact-finder’s conclusions were reasonable under the evidence presented. When a factfinder’s determination is based on its decision to credit the testimony of one of |Rtwo or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id. [Citations omitted.]
Kuebel first claims that the trial court erred in concluding that the note at issue was not an absolute nullity and in relying on the Smith decision as authority for that conclusion. He contends that the trial court made certain factual findings unsupported by the evidence in an attempt to render the facts of this case indistinguishable from the facts in Smith. Kuebel now attempts to distinguish himself from the Smith defendant in order to support his argument that the Smith decision is not controlling in this case.
Kuebel points out various differences between the transaction in this case and the Smith transaction. First, unlike Smith, Mr. Kuebel claims that he received no STC stock, no prospectus, no consideration for his promissory note and that he signed no subscription agreement. He states that the stock pledge agreement introduced into evidence at trial indicated that he was issued stock certificate number 258 on March 19,1984, representing 18,939 shares of stock. However, the eventual note he executed was for 19,128 shares of stock. He also argues that key documentation relied upon by the Smith court is totally absent from the record in this case. Thus, Kuebel urges that the cases are not analogous, and that the trial court erred in finding the cases were “incredibly similar.” We disagree with Kuebel’s contentions.
Even though there are some differences between the transactions involving the defendant in the Smith case and defendant Kuebel in this case, after reviewing the record, we conclude that those differences are not significant enough to ignore the well-reasoned precepts set forth by the First Circuit in Smith. Thus, we are unable to conclude that the trial court committed manifest error in reaching its factual finding that Smith and this case are “incredibly similar” or legal error in misapplying to this case the principals of law stated in Smith. Kuebel’s first claim thus lacks merit.
Kuebel next asserts that the trial court erred in finding valid consideration existed for the note enforceable against him as an in personam obligation rather than constituting an in rem obligation. He maintains that he never received deliv *975 ery of the FNC stock. While Mr. Kuebel may not have received actual corporal possession of the stock at issue, the record simply does not show that Kuebel received nothing of value in this case. He admitted signing the promissory note, executing a stock pledge agreement, selling shares of stock at a profit, applying the proceeds to his principal balance and paying the interest on the note for four years. Additionally, Mr. Kuebel was listed in the bank’s records as the owner of 38,256 shares. The trial testimony of both Manuel Guitterez, attorney for FNC, and Richard Blossman indicates that all investors received a prospectus. Mr. Kuebel’s testimony in this case was inconsistent at best. Mr. Kuebel also disagrees with the trial court’s assessment of him as a “well-lettered” man who understood the benefits and risks associated with this transaction. The record reflects that Mr. Kuebel was carrying a $17 million dollar investment portfolio at the time he agreed to the transaction, that he had enjoyed favorable business dealings with Case and Brocato in the past and that he researched the bank’s stability to his own satisfaction. Accordingly, we defer to the trial court’s findings of fact on these issues. And we agree that the promissory note executed by Mr. Kuebel on July 3, 1984 constituted a valid in personam, negotiable instrument enforceable against Mr. Kuebel.
Mr. Kuebel’s final assertion is that the trial court erred in denying his post-trial motion to dismiss this case on grounds of abandonment. He argues on appeal that this case became abandoned between 1996 and 1999 because plaintiff failed to |intake any action to hasten this matter to judgment. La.Code Civ. P. art. 561 provides in pertinent part that:
A. (1) An action is abandoned when the parties fail to take any step in its prosecution or defense in the trial court for a period of three years, unless it is a succession proceeding....
(2) This provision shall be operative without formal order, but, on ex parte motion of any party or other interested person by affidavit which provides that no step has been taken for a period of three years in the prosecution or defense of the action, the trial court shall enter a formal order of dismissal as of the date of its abandonment. The order shall be served on the plaintiff pursuant to Article 1313 or 1314, and the plaintiff shall have thirty days from date of service to move to set aside the dismissal. However, the trial court may direct that a contradictory hearing be held prior to dismissal.
B. Any formal discovery as authorized by this Code and served on all parties whether or not filed of record, including the taking of a deposition with or without formal notice, shall be deemed to be a step in the prosecution or defense of an action....
The record shows that a supplemental and amended petition was filed in March 1996 and Kuebel answered in May 1996. In March 1999, interrogatories were mailed to Kuebel but were not made part of the record until plaintiff opposed the motion to dismiss in April 2002. In April 1999, Kuebel filed a motion for extension of time to respond to the interrogatories. We thus find no error in the trial court’s denial of the motion to dismiss this case of grounds of abandonment.
For the foregoing reasons, the trial court’s judgment is affirmed.

AFFIRMED.